511 So.2d 323 (1987)
GROVES-WATKINS CONSTRUCTORS, Appellant,
v.
STATE of Florida, DEPARTMENT OF TRANSPORTATION, Appellee.
No. BR-163.
District Court of Appeal of Florida, First District.
June 11, 1987.
On motion for Rehearing August 4, 1987.
*325 David S. Dee of Carlton, Fields, Ward, Emmanuel, Smith, Cutler & Kent, P.A., Tallahassee, for appellant.
Robert I. Scanlan, Deputy General Counsel, Dept. of Transp., Tallahassee, for appellee.
SMITH, Judge.
We must determine in this contract bid dispute whether the original low bidder on a highway construction project is entitled to award of a contract for the project where the Department of Transportation, after receipt of the initial bids, rejected all bids as excessive and directed that the project be rebid. An administrative hearing officer assigned to hear the case found that the original low bidder, appellant, was entitled to award of the contract; but the department in its final order declined to adopt the decision of the hearing officer, and denied the award. We reverse.
Appellant, Groves-Watkins Constructors (G-W), contends that the Department of Transportation (DOT) erred in two respects in dismissing its administrative bid protest. First, G-W contends that DOT violated section 120.57(1)(b)9, Florida Statutes (1985), by reweighing the evidence, rejecting the hearing officer's findings of fact, and substituting its own findings of fact even though the hearing officer's findings are supported by competent, substantial evidence in the record. Next, G-W contends that DOT committed reversible error when it based its decision to dismiss G-W's bid protest on new legal and factual issues raised by DOT for the first time in its final order.
G-W is a joint venture comprised of two large corporations which joined together for the purpose of bidding on certain DOT projects, among them "Package U", at issue in this case. Package U involves the construction of a complex highway interchange in Broward County which includes a substantial amount of embankment and many bridges, six of which will be built with pre-cast concrete segments. Three joint ventures bid on Project U, and G-W's bid of $54,472,335.15 was the lowest.
DOT's non-rule policy dictates that, for projects valued at more than $250,000, a contract will be automatically awarded if the lowest bid is no more than seven percent (7%) above DOT's estimate of the project's value. If the lowest bid is more than seven percent (7%) above the DOT estimate, the bidding process is reviewed by DOT, and DOT may or may not award the contract, depending on the circumstances. In this case, DOT's bid estimate for Package U was approximately $41.5 million, making G-W's bid twenty-nine percent (29%) over the bid estimate. When DOT notified G-W of its intent to reject G-W's bid because it was too high and more than seven percent above DOT's estimate, G-W filed a formal bid protest, contending that DOT's bid estimate was arbitrarily and unreasonably low. G-W petitioned for and was granted a formal administrative hearing. Thereafter, the hearing officer entered a comprehensive recommended order setting forth extensive findings of fact substantially establishing the correctness of G-W's contentions, and concluding that G-W was entitled to award of the contract. DOT rejected these findings and conclusions and denied the relief sought by G-W. This appeal followed.
The parties agree that there are three items which accounted for most of the discrepancy between DOT's estimate and G-W's bid: (1) the embankment material; (2) the pre-cast concrete bridge segments; and (3) mobilization costs. These discrepancies, in the aggregate, amount to approximately $12.2 million, and account for approximately 95% of the difference between G-W's bid and DOT's estimate.
At the outset, the hearing officer found that G-W has a substantial amount of experience in performing the work involved in Project U and has unique experience in the design, construction, estimating and bidding involving segmented, precast concrete bridges. By contrast, the hearing officer found that DOT had very little experience with segmented bridge construction, especially with regard to the complex-curved segmented bridge construction involved in Package U.
*326 The hearing officer found that G-W arrived at its bid on the embankment fill by using historical data and site-specific data, which was acquired by personally contacting suppliers and subcontractors in the surrounding area of the job site and which was verified only one to two days before the bid submittal. In contrast, the hearing officer found that in arriving at its bid estimate, DOT used historical cost data which involved noncomparable projects, and site-specific data which was outdated. The hearing officer noted that the bids received for embankment on a project known as Package M, a substantially identical interchange located fifteen miles from Package U, were higher than G-W's bid for embankment in Project U, thus corroborating G-W's showing that its embankment bid on Package U was a reasonable one, and based upon the most current market prices, and further, that DOT's estimate was based on out-of-date, not entirely comparable cost information, and is inaccurate. Based on the evidence presented the hearing officer found that DOT underestimated the embankment material costs by $6,000,000.
Next, the hearing officer accepted the expert testimony of Richard Kelly, the executive vice president of Groves, that on a scale of 1 to 10, the bridgework on Package U would rate at least a "9" in difficulty of execution. DOT arrived at its estimate for the bridge segment portion of this project after retrieving historical price data from its computer concerning other Florida bridge construction projects such as the Sunshine Skyway Bridge and the bridges in the Florida Keys. However, the hearing officer found that these bridges did not present difficulties in construction comparable to the bridges in Package U, in that they were built over water, under conditions of light traffic, and were relatively straight bridges as opposed to the curved bridge surfaces in Project U. On the other hand, G-W's bid price for bridge segments was based on actual quotes from local materialman, suppliers and subcontractors and these quotes were evaluated in light of the historical data and experience that G-W has accumulated in working on other segmental bridge projects. G-W based its price for the bridge segments on: (1) the cost of manufacturing the segments, including labor and equipment; (2) the cost of storing and transporting segments once they were cast; (3) the cost of erecting, grouting, and posttensioning the segments; and (4) the cost involved in subcontracting the painting and finishing work on the bridge surfaces after the segments were erected. The hearing officer found that:
The use of these four factors in Groves' arriving at its price for the segmental portion of the project was thus demonstrated to be reasonable and appropriate. DOT did not challenge the propriety of including these four factors in the estimate of the direct cost for the bridge work and offered no evidence suggesting that the costs assigned to these four elements were inappropriate.
He also found:
The evidence does not clearly reveal the specific manner in which DOT formulated its estimate for the bridge segment portion of this project other than its reliance upon historical pricing information for other bridge-interchange construction projects. That reliance on historical price data, or at least the data relied upon was shown to be inappropriate for the bridge construction involved in this proceeding. Package U involves a complex segmental bridge which is a unique type of construction and design and of which there are few comparable examples thus far in Florida... . The complexities of casting and erecting so many differently configured segments [in Package U] causes substantial increase in manufacturing costs and erection time and difficulty, all of which renders the project substantially more expensive and significantly dissimilar to those projects relied upon by the Department for its historic cost and price examples.
The hearing officer found in his recommended order that DOT had underestimated the precast bridge segment portion of the job by about $5,000,000.
For comparison purposes, the hearing officer received and considered evidence noting *327 that DOT had grossly underestimated the cost of Package M, which was the only other project identified at the hearing that involved complex, segmental bridge construction. At the first bid letting for Package M, DOT received only one bid, that of G-W, which was approximately $20 million over DOT's estimate of approximately $41 million. DOT rejected G-W's bid, and again solicited bids after raising its estimate to $50 million. Seven bids were received on rebidding, but the lowest bidder was still more than $10 million over DOT's estimate. Although the lowest bid was more than twenty percent above DOT's estimate, DOT awarded the contract in that case. The hearing officer found that:
[DOT's] problems with Package M corroborate the remainder of [G-W's] proof, in showing that the Department erred in estimating the cost of Package U involved herein and relied upon historical price information not shown to be applicable to the unique, complex project like the instant one.
Finally, the hearing officer found, and DOT does not dispute, that DOT's estimate of mobilization costs did not include the costs for the pre-casting yard in the amount of $1.2 million.
The hearing officer summarized the evidence as follows:
[I]t has been established that DOT underestimated the value of Package U in the following manner: (1) embankment was underestimated by about $6,000,000. (2) The pre-cast bridge segment portion of the job was underestimated by about $5,000,000. (3) The cost of mobilization was underestimated by at least $1.2 million. Therefore, the total DOT estimate of a reasonable and appropriate price for this project is at least $12.2 million too low. If the Department's estimate of $41.5 to $42.4 million was corrected by adding this $12.2 million, then the total revised estimate for Package U would be $53.7 to $54.6 million. Groves bid $54.4 million which bid would be no more than 1.3 percent higher than DOT's thus corrected estimate. If the DOT corrected estimate were a total of $54.6 million, it would actually be 3/10 of a percent higher than Groves' bid. Obviously, if the "seven percent policy" of the Department were applied to that corrected estimate, the Department would be required to reward the contract to Groves.
The hearing officer concluded his findings of fact thusly:
The Department offered no evidence in support of its rejection of the bid except for its erroneous analysis of the difference between the bid price and its original estimate. It did not introduce any proof to establish that a rebid of the package would result in more competition between bidders or significantly lower bid price. Since there is no evidence that such an advantage would occur if the project were rebid, a decision to rebid the project instead of award it to the lowest bidder of three qualified bidders would be an unfounded and arbitrary decision. If the Department rebid the package, the Petitioner would have to spend an additional $40,000 to $150,000 to prepare for the new bid and the Petitioner would also suffer a detriment as a result because its competitors would have some advantage in knowing Groves' best prices on the elements of the project. Additionally, Groves would be required to keep its employees, equipment, and bonding capacity committed to this project on reserve while the rebidding process was accomplished, thus diminishing its ability to successfully bid on other projects until a decision was made on the rebidding. It has thus been established that the Department's original estimate was flawed and unreasonable in the circumstances and that that bid submitted by Groves was a responsive, reasonable bid and, without dispute, is the lowest bid submitted.
The hearing officer concluded that DOT had acted arbitrarily and capriciously in rejecting the bid on the basis of its seven percent policy since its estimate was shown to be fatally flawed, and recommended that DOT award the contract to G-W.
In its final order, DOT accepted the hearing officer's findings of fact in part and *328 rejected them in part, and rejected his conclusions of law. Based on substituted findings of fact and conclusions of law, DOT dismissed G-W's bid protest and ordered that Package U be readvertised as soon as possible.
We find after a thorough review of the record below that there was competent, substantial evidence to support the hearing officer's findings of fact and that DOT erred in rejecting those findings of fact and substituting its own findings on the issues presented. As this court has stated:
Factual issues susceptible of ordinary methods of proof that are not infused with policy considerations are the prerogative of the hearing officer as the finder of fact. McDonald v. Department of Banking & Finance, 346 So.2d 569 (Fla. 1st DCA 1977). It is the hearing officer's function to consider all of the evidence presented, resolve conflicts, judge credibility of witnesses, draw permissible inferences from the evidence, and reach ultimate findings of fact based on competent, substantial evidence. State Beverage Department v. Ernal, Inc., 115 So.2d 566 (Fla. 3d DCA 1959). If, as is often the case, the evidence presented supports two inconsistent findings, it is the hearing officer's role to decide the issue one way or the other. The agency may not reject the hearing officer's finding unless there is no competent, substantial evidence from which the finding could reasonably be inferred. The agency is not authorized to weigh the evidence presented, judge credibility of witnesses, or otherwise interpret the evidence to fit its desired ultimate conclusion.
Heifetz v. Department of Business Regulations, 475 So.2d 1277, 1281 (Fla. 1st DCA 1985). Accord, Howard Johnson Co. v. Kilpatrick, 501 So.2d 59, 60 (Fla. 1st DCA 1987); and Tuveson v. Florida Governor's Council on Indian Affairs, Inc., 495 So.2d 790 (Fla. 1st DCA 1986).
DOT has failed to demonstrate that the factual issues in this case are matters of opinion which are infused with policy considerations within the abmit of its expertise. Compare Hammond v. Department of Transportation, 493 So.2d 33, 35 (Fla. 1st DCA 1986). DOT did not claim special expertise in arriving at prices for embankment material or pre-cast concrete bridge segments. In fact, in its final order, DOT recognizes that contractors submitting the low bid will, in one sense, always have the best and most current cost information since they have the beneficial position of bargaining with subcontractors and receiving up to the minute price quotes. Since the determination of this case does not involve factual issues infused with policy considerations, the general rule  that the hearing officer's findings of fact must prevail if supported by competent, substantial evidence  must be applied.
DOT has failed to demonstrate that the hearing officer's findings of fact are not supported by competent, substantial evidence. Instead, DOT maintains that its decision may not be overturned unless it is proven that its decision was made as the result of fraud, corruption, or unfair dealing. Willis v. Hathaway, 95 Fla. 608, 117 So. 89 (1928). DOT argues that even if this court believes that DOT's exercise of discretion was erroneous, it cannot overturn DOT's final order since it was based on an honest exercise of discretion, citing Liberty County v. Baxter's Asphalt & Concrete, Inc., 421 So.2d 505, 507 (Fla. 1982).
While it is true that DOT has wide discretion in awarding contracts to responsible bidders, it still cannot act arbitrarily and capriciously when deciding whether to award a contract. Willis v. Hathaway, 117 So. at 95. Baxter's Asphalt & Concrete, Inc. v. Department of Transportation, 475 So.2d 1284, 1286-7 (Fla. 1st DCA 1985); Capeletti Brothers, Inc. v. State Department of General Services, 432 So.2d 1359, 1363 (Fla. 1st DCA 1983); and Wood-Hopkins Contracting Co. v. Roger J. Au & Son, Inc., 354 So.2d 446 (Fla. 1st DCA 1978). DOT recognized in its final order that its discretion cannot be exercised arbitrarily or capriciously. Accordingly, DOT does not have unbridled discretion to reject any and all bids with or without cause, Wood-Hopkins, 354 So.2d at *329 450, and we do not accept DOT's contention that G-W was required to prove fraud, corruption, or unfair dealing to overturn DOT's decision.
DOT's reliance on the Liberty County case for the proposition that it may reject G-W's bid so long as it exercises its discretion honestly is misplaced. The issue in Liberty County was whether the county could waive a minor defect when awarding a contract. Moreover, Liberty County dealt with a dispute arising prior to adoption of section 120.53(5), Florida Statutes (1981), a statute specifically designed to provide a process for resolution of bidding controversies in the administrative arena. The issue in this case is whether DOT can reject G-W's bid after the hearing officer assigned to conduct a de novo administrative hearing pursuant to the applicable statute finds, based upon competent, substantial evidence in the record, that DOT's decision to reject G-W's bid was arbitrary and capricious, and was not based upon facts which reasonably support the conclusion to reject G-W's bid. Here, unlike the Liberty County case, DOT's challenged decision (rejection of all bids and denial of award to G-W), never became final agency action until after completion of the administrative hearing and entry of a final order by DOT. Here again, as we pointed out in Capeletti, 432 So.2d 1359, a party (this time DOT) has misconceived the purpose of a section 120.57 hearing. "As we have previously held, APA hearing requirements are designed to give affected parties an opportunity to change the agency's mind." Id. at 1363.
DOT relies heavily upon Charles Harney, Inc. v. Durkee, 107 Cal. App.2d 570, 237 P.2d 561, 31 A.L.R.2d 457 (Cal.Dist.Ct. App. 1951). DOT fails, however, to note that the California case did not involve the use of a statutorily-mandated bidding dispute resolution procedure such as we deal with in the present case. The California case was an action "by writ of mandate," seeking to compel the award of a public contract to the low bidder. The appellate court reversed the trial court's determination that the highway department's action in rejecting all bids was subject to correction by the court, because, the appellate court found, even assuming the department's actions to be controllable by the courts for an abuse of discretion, on the record before it there was "no abuse of discretion." The Durkee case therefore not only does not support DOT's argument that it has unbridled discretion to reject all bids; the case actually has no precedential significance with respect to the issues before us because of the differences in the litigational posture of the two cases. Indeed, in Florida, we might add, a litigant seeking relief on the same basis as did the Harney Company in Durkee would be doomed to failure at the outset, since to obtain relief by writ of mandamus the act sought to be compelled must be one ministerial in character, not one requiring the exercise of discretion. City of Miami Beach v. Mr. Samuels, Inc., 351 So.2d 719 (Fla. 1977).
To adopt DOT's argument in this case would make DOT virtually immune from Chapter 120 processes. Section 120.57(1)(b)9, Florida Statutes (1985), mandates that an agency accept the factual determinations of a hearing officer unless those findings of fact are not based upon competent, substantial evidence. Heifetz, 475 So.2d at 1281. G-W introduced competent, substantial evidence, which the hearing officer relied upon, that its low bid was a responsive, reasonable bid, and that DOT's estimate was erroneously arrived at and unreasonable. In response, DOT simply introduced evidence that it arrived at its estimate by retrieving historical data concerning other projects from its computer. Even though faced with evidence that this historical data did not accurately reflect the cost for this particular project, since the data retrieved by DOT involved dissimilar projects which did not have the degree of complexity that Package U had, DOT failed to present evidence which rebutted the evidence presented by G-W. Further, DOT failed to introduce evidence which explained the discrepancy between its estimate and G-W's bid.
*330 In its final order, DOT introduced factual and legal issues not raised at the administrative hearing, in an attempt to support its contention that it had correctly refused G-W's bid. In its order DOT raises for the first time the necessity for concurrence by the federal highway administration in all contract awards, cites the absence of proof that such concurrence had been given to G-W's bid, and contends that without such concurrence the state will suffer the loss of some $37-$49 million in federal aid for this project. The record is devoid of evidentiary support for the factual assertions made by DOT in reaching this conclusion, and DOT also failed to raise this legal argument before the hearing officer in defense of its rejection of the bid. As stated earlier, the only evidence offered by DOT in support of its rejection of the bid was the difference between the bid price and DOT's estimate. Accordingly, we agree with G-W's contention that DOT's reliance on this untimely asserted reason for rejecting G-W's bid violates procedural due process and Chapter 120, Florida Statutes, and must be disregarded. Thorn v. Florida Real Estate Commission, 146 So.2d 907 (Fla. 2d DCA 1962); see also §§ 120.57(1), 120.57(1)(b)2.d., and 120.57(1)(b)4., Florida Statutes.
Finally, we take issue with representations contained in the dissenting opinion with respect to budgetary constraints, changed conditions, or the effect of redesigning or alteration of the project by DOT as offering additional defenses for DOT's rejection of all bids. None of these matters were asserted in defense below, and did not appear from any evidence offered or presented to the hearing officer. Furthermore, there is nothing in the record before us in this case to substantiate the dissenting opinion's reference to actions taken by DOT on rebidding of the project, or the results of those actions. We can and do assume, in the absence of evidence to the contrary, as to which there is none, that G-W, as the initial low-bidder on this project, is as well or better situated than any other contractor to respond to changed conditions which might effect a savings of cost on the project; and we have before us no legal or factual basis for rendering a judgment that any beneficial changes could not just as easily have been made within the framework of the contract that should have been awarded to G-W.
For the reasons expressed, we reverse and remand with directions that DOT award the contract on Project U to G-W.
REVERSED.
BOOTH, C.J., concurs.
ERVIN, J., dissents with Opinion.
ERVIN, Judge, dissenting.
I respectfully dissent. The majority's opinion ignores the clear precedent of the Florida Supreme Court in Liberty County v. Baxter's Asphalt & Concrete, Inc., 421 So.2d 505 (Fla. 1982), providing the standard of review in competitive bidding cases. The opinion substitutes a new policy for that of the DOT and thus erroneously determines that the rejection of the bid was arbitary and capricious.
Liberty County establishes the standard for review of an agency's decision regarding the solicitation and acceptance of a bid for a public contract: "[A] public body has wide discretion in soliciting and accepting bids for public improvements and its decision, when based on an honest exercise of this discretion, will not be overturned by a court even if it may appear erroneous and even if reasonable persons may disagree." Id. at 507 (e.s.). To overturn a decision of a public body in regard to the award of a contract, there must be a finding of "illegality, fraud, oppression or misconduct." Id. There was no such finding made by the hearing officer, and even if there were one, it would have lacked a sufficient evidentiary basis.
The majority's opinion distinguishes away Liberty County, describing it as involving a question only of whether a "county could waive a minor defect when awarding a contract." Ante at 329. Virtually no difference, however, exists between the statutory discretion of the DOT to reject all bids and the authority of a county to reject bids for road construction. Compare *331 Section 336.44(5), Florida Statutes, governing the construction of county roads: "The commissioners may reject any or all bids and require new bids to be made", with Section 337.11(3), Florida Statutes, regarding the construction of all roads designated as part of the state highway system: "The department may award the proposed work to the lowest responsible bidder, or it may reject all bids and proceed to readvertise the work or otherwise perform the work."
Although Liberty County involved a bid solicited by the county for the construction of a county road, it relied on earlier case law that had recognized the similarities between the public contract process at the various levels of state government. See Culpepper v. Moore, 40 So.2d 366 (Fla. 1949), cited in Liberty County at 507, a school board case in which the court referred to both the statute and caselaw governing a predecessor agency to DOT in its interpretation of the extent of the discretion a school board has in determining what constitutes "the lowest responsible bidder."
The majority's opinion cites several cases for its position that DOT cannot act arbitrarily and capriciously in deciding whether to award a contract. Two of those cases referred to Liberty County as the standard of review in bidding cases involving state agencies. See Baxter's Asphalt and Concrete, Inc. v. Department of Transportation, 475 So.2d 1284 (Fla. 1st DCA 1985); Capeletti Brothers, Inc. v. State of Florida Department of General Services, 432 So.2d 1359 (Fla. 1st DCA 1983).
One additional case cited by the majority, Wood-Hopkins Contracting Company v. Roger J. Au & Son, Inc., 354 So.2d 446 (Fla. 1st DCA 1978), held that an agency (the Jacksonville Electric Authority) did not have unbridled authority to reject any and all bids without cause. The court quoted McQuillin, Municipal Corporations, § 29.77, stating the rule as follows:
In exercising the power to reject any or all bids, and proceeding anew with the awarding of the contract, the officers cannot act arbitrarily or capriciously, but must observe good faith and accord to all bidders just consideration, thus avoiding favoritism, abuse of discretion, or corruption. Even where the right to reject any and all bids is properly reserved, the bidding law may not be evaded under the color of rejection.
354 So.2d at 450.
The court in Wood-Hopkins uses the term "arbitrary, unreasonable or capricious" to describe when a government entity cannot reject all bids. Id. The court stated that an agency cannot reject all bids for the purpose of circumventing the competitive bidding statute. In the instant case there was no showing that the rejection of all bids was an attempt to circumvent the competitive bidding statute.
There is no conceptual reason why the standard for review in state bidding cases that are governed by the Administrative Procedure Act (APA) should be different from the standard of review in local bidding cases. The APA is a procedural mechanism, providing a forum to exert rights. It does not change substantive law.[1]See Reporters Comments on Proposed Administrative Procedure Act for the State of Florida, reprinted in 3 A. England and L. Levinson, Florida Administrative Practice Manual at 3 (1979), observing that the APA is intended to provide "due process minima for the operation of Florida Administrative agencies... ." The fact that a party under the APA can request a section 120.57 hearing, as opposed to challenging the actions of local government in circuit court, should not change the standard of review in determining the correctness of the action taken.
The deference given by Liberty County to an agency's decision in bidding cases is consistent with the general rule that governmental entities cannot be compelled to *332 accept the low bidder, and they enjoy the prerogative to reject all bids generated in the competitive bidding process. See 64 Am.Jur.2d. Public Works and Contracts § 87. ("Public authorities are generally vested with a wide discretion in determining who is the lowest responsible bidder, and indeed, usually are vested with power to reject all bids and ask for new ones... ." (citations omitted)). See also Annot., 31 A.L.R.2d 469 (1953) (governmental entities generally have the right to reject all bids whether or not there is an express statutory or constitutional provision allowing the rejection of the bids).
In the present case, DOT was given explicit statutory authority by Section 337.11(3), Florida Statutes, to reject all bids. Notice was also provided in the bid package, advising that DOT reserved the right to reject all bids if the lowest bid received exceeded the engineer's estimate by more than seven percent.
With the exception of some cases that require an absence of bad faith or favoritism, the caselaw generally accords unbridled discretion to public agency to reject bids. See Kenneth E. Curran, Inc. v. Auclair Transportation, Inc., 121 N.H. 451, 431 A.2d 124 (1981) (trial court properly dismissed transportation company's suit for relief, after state had rejected all bids, on the grounds that there had been no proof of fraud, corruption, or improper motive, and that the state had expressly reserved its right to reject all bids); Highway Express Lines, Inc. v. Winter, 414 Pa. 340, 200 A.2d 300 (1964) (city had the authority to reject all bids, absent fraud or collusion motivating such action).
Finally, perhaps the strongest case supporting affirmance is Charles Harney Inc. v. Durkee, 107 Cal. App.2d 570, 237 P.2d 561, 31 A.L.R.2d 457 (Cal.Dist.Ct.App. 1951), wherein the low bid on a freeway project exceeded the department's estimate by 17 percent. The state highway engineer decided to reject the low bid even after being advised by his staff that the original bid had been prepared in error. In upholding the department's decision to reject the bid, the court observed that discretion abides in the highway authority to reject all bids if the director deems it is in the best interests of the state. The court accepted the rationale of the highway director who found it would be improper to revise the department's cost estimate for construction of a road after the bids had been submitted. The court concluded that where the cost estimate was prepared in error, "[it] was the same as if no estimate at all had been prepared, because an erroneous estimate cannot and should not be used to measure the fairness of a bid." 237 P.2d at 566.
There are to be sure cases that require good faith or just cause as a basis for rejecting all bids, notwithstanding the public agency's reservation of the right to reject all bids in its invitation to bid. See Butler v. Federal Way School District, 562 P.2d 271 (Wash. Ct. App. 1977) (rejection of low bid improper absent good cause, even with reservation to reject any or all bids). In Florida, however, a public agency enjoys greater discretion, as all the department had to show is that its decision to reject met the Liberty County standard of a lack of fraud, oppression or misconduct, and, even if a good faith or just cause standard of review were applied in the instant case, no proof was adduced nor any allegation made that the department acted in bad faith or without good cause in rejecting the bids.
Analyzing the instant case pursuant to contract law, Grove-Watkins has no right to compel performance of a contract, because it has never entered into a contract with DOT. The mere request for bids, while reserving the right to reject all bids, does not give the lowest bidder any contractual rights.[2]
*333 The recommended order in its findings of fact states that the department's cost estimate was $12 million below the amount actually needed to construct the project and concludes that the Grove-Watkins bid is actually three-tenths of a percent less than a corrected DOT cost estimate. Accepting the hearing officer's finding as supported by competent, substantial evidence would not, however, require award of the contract to the offerer, since, as stated, an unrealistic construction estimate cannot, in and of itself, meet the Liberty County standard of review in competitive bidding cases. The hearing officer, moreover, did not base his recommended order solely upon competent, substantial evidence, but in effect made a policy determination requiring that DOT must recalculate its cost estimate based on the figures provided by the low bidder, if there is more than a seven percent differential between the cost estimate and the low bid. In making this recommended finding, the hearing officer substituted his policy for that of DOT, a recommended policy, which, if sustained, takes from the department the right to do its own cost estimate, based on independent data, and directs the public agency to accept the data provided by the low bidder. By taking this additional step, the DOAH officer has departed from his traditional role in a 120.57(1) proceeding as fact-finder and has become a policy-maker.
The officer next states that no showing was made that a rebid would result in any cost savings to the department, in that a rebid would cost Grove-Watkins $40,000 to $150,000, and would force Grove-Watkins to maintain its bonding capacity. The fact that Grove-Watkins may sustain additional costs has no relevancy to the question of whether the state may suffer any increased costs on a rebid, and is certainly not supportive of any determination of arbitrariness or capriciousness.
The finding of fact that rebidding the same project would not result in a cost savings is also irrelevant, as it presupposes the DOT is obligated to rebid the same project. As was noted in Harney:
The reasonable possibility of securing a lower bid, if all original bids are rejected, is not the only factor that may be considered by the director in determining whether acceptance or rejection is in the best interests of the State... . [T]he director, .. . can determine whether money is available for the project, and, if so, whether the department desires to undertake the project at the estimated cost.
237 P.2d at 565. The finding ignores other factors, such as budgetary constraints,[3] additional information and changed conditions, and that the DOT may seek to redesign the project and thus lower the project's costs.
If we adopt the substituted policy of the hearing officer, an agency could never redesign a project and could never effectuate cost savings. The policy of the hearing officer turns the competitive bidding process on its head, making it a process for the benefit of the contractor doing the bidding, instead of for the benefit of the public. If we also accept the finding that DOT made an erroneous cost estimate, or even that DOT grossly underestimated the cost of the project, its error should not bind it to accept the bid of the contractor, which the department decided it could not afford, and for which monies had not been budgeted. *334 See Law Brothers Contracting Corp. v. O'Shea, 79 A.D.2d 1075, 435 N.Y.S.2d 812 (App.Div. 1981) (rejection of all bids based on budgeting, financial and planning factors was not arbitrarily or capriciously grounded).
The present case should have involved only one disputed factual issue: whether DOT's decision in rejecting all bids was in compliance with the Liberty County v. Baxter's Asphalt & Concrete, Inc., standard. Although Liberty County arose from a different factual context than that in the instant case, involving an attempt by a disappointed bidder to enjoin in circuit court the county from entering into a contract with another contractor, and the present case is one in which the low bidder seeks in an administrative hearing the award of the contract to it, thereby setting aside DOT's decision to reject all bids, the standard of review is clearly the same in both cases. The majority's opinion, in accepting the hearing officer's recommended findings, appears to authorize a lesser standard than that recognized in Liberty County, or indeed practically every other case that has addressed a similar question. The effect of such an opinion will have far-reaching consequences upon a public agency's heretofore considered wide discretion to reject bids, even if its reasons are erroneous. It will establish a precedent for disappointed bidders to seek specific performance of a non-existent contract, on evidence showing merely an erroneous exercise of discretion.

OPINION ON MOTION FOR REHEARING
SMITH, Chief Judge.
Appellee, Department of Transportation (DOT) has filed a motion for rehearing challenging several aspects of the majority's decision as set forth in our original opinion. We deny the motion for rehearing except as to the form of the order with which we concluded our previous decision, as to which we agree that further consideration is necessary, and therefore modify that portion of our decision as hereinafter set forth.
The department asserts that the reviewing court has no authority to correct the decision of an agency as to which the agency has discretion, arguing that by doing so, the court has, in effect, usurped powers reserved to the executive branch. We disagree. This court's broad power to review proceedings arising under Chapter 120, the Administrative Procedure Act, and to order remedial action is legislatively based, as appears from the plain reading of section 120.68(11), (13)(a), Florida Statutes:
(11) If the agency's action depends on facts determined pursuant to subsection (6), the court shall set aside, modify, or order agency action if the facts compel a particular action as a matter of law, or it may remand the case to the agency for further examination and action within the agency's responsibility.
* * * * * *
(13)(a) The decision of the reviewing court may be mandatory, prohibitory, or declaratory in form; and it shall provide whatever relief is appropriate irrespective of the original form of the petition. The court may:
(1) order agency action required by law, order agency exercise of discretion when required by law, set aside agency action, remand the case for further agency proceedings, or decide the rights, privileges, obligations, requirements or procedures at issue between the parties; and
(2) order such ancillary relief as the court finds necessary to redress the effects of official action wrongfully taken or withheld.
The department's apparent assumption that it possesses powers to act in the matters at hand in its sole discretion, immune from the processes of the law as found in Chapter 120, including judicial review and intervention as necessary to implement decisions arrived at via that process, is contrary to the explicit language of the statutes and the case law of the courts of this state interpreting the same.
On another point, the department suggests that this court has overlooked pleadings *335 filed in this cause which "put the court on notice" of events occurring outside the context of the proceeding which we are here called upon to review, and indeed, outside the parameters of any proceeding wherein the rights of G-W have been taken into account and adjudicated.[1] We have found insufficient allegations in any of these "pleadings" as to extraneous matters to deter a ruling on the merits of the matter before us. Significantly, at no time during this litigation, either before the hearing officer or in this court, has DOT filed a motion to dismiss or suggestion of mootness requesting remand for the purpose of a hearing for the presentation of evidence as to any factual matters bearing upon the availability of the relief sought by G-W. From the file of a related case (see footnote 1), it affirmatively appears that DOT eschewed recourse to a further administrative hearing, subsequent to the initial hearing which resulted in a decision adverse to DOT, by denying G-W's standing to challenge the award of a contract to another contractor on rebidding.
The department also urges that the propriety of its actions in proceeding with the rebidding of the project is enhanced by the fact that it has never been specifically ordered to cease and desist. Again we disagree. We are of the view that an agency, as any other litigant, proceeds at its peril when its authority to act has been challenged and is presently under review. See, First National Bank of Miramar v. Lewis, 355 So.2d 869 (Fla. 1st DCA 1978); Mann v. Thompson, 118 So.2d 112 (Fla. 1st DCA 1960). Furthermore, this court has rejected the argument in a bidding dispute that any practical relief to the contesting bidder is precluded when the contract is already being executed, pointing to the ancillary relief provisions of section 120.68(13)(a)2, Florida Statutes. Baxter's Asphalt and Concrete, Inc. v. Department of Transportation, 475 So.2d 1284, 1286 (Fla. 1st DCA 1985).
The department contends, nevertheless, that this court lacks authority to order it to award the contract to G-W. In Wood-Hopkins Contracting Company v. Roger J. Au & Son, Inc., 354 So.2d 446 (Fla. 1st DCA 1978), this court upheld a circuit court judgment enjoining the award of contracts to one bidder, and ordering the public contracting authority to award contracts to another contractor, the lowest bidder. Availability of the remedy of ordering the award of a contract to a specific bidder was assumed in Baxter's Asphalt & Concrete, Inc., v. Liberty County, 406 So.2d 461, 465 (Fla. 1st DCA 1981), rev'd on other grnds., 421 So.2d 505 (Fla. 1982). Upon review of a circuit court declaratory judgment, the Third District, in Marriott Corporation v. Metropolitan Dade County, 383 So.2d 662 (Fla. 3rd DCA 1980), reversed the judgment of the lower court denying relief and ordered *336 the award of the contract to the lowest bidder.
Finally, as to the form of the order with which we concluded our original opinion, we agree that clarification is warranted. In our previous opinion, we simply concluded with the statement that we "reverse and remand with directions that DOT award the contract on Project U to G-W." Our decision that DOT wrongfully rejected G-W's bid and thus improperly ordered rebidding is declaratory as to the rights and obligations of the parties. Although we arguably should have phrased our opinion differently, by ordering DOT to enter an order accepting G-W's bid, we consider the actual entry of such an order by DOT as a mere formality. Our decision reversing the order of DOT and finding G-W entitled to the contract accords G-W the status of a successful bidder, and places the parties in the equivalent of a contractual relationship, even in the absence of a formal, signed contract. See, Wood-Hopkins, supra, 354 So.2d at 448.
Accordingly, we direct that this case on remand shall proceed as follows: The DOT shall have ten (10) days from the issuance of our mandate in this cause within which to amend its order of December 16, 1986, by deleting all findings and conclusions contrary or in addition to those made by the hearing officer in his recommended order, including the provision ordering rebidding of the project, and to enter an order awarding the contract to G-W in accordance with its low bid previously received. Upon DOT's failure to enter its order as directed, the recommended order of the hearing officer in this cause dated November 5, 1986, shall be deemed adopted in its entirety by the department (see section 120.57(1)(b)9), and said recommended order shall be deemed the order of DOT entered pursuant to the section 120.57(1) bid protest proceeding held in this cause, and shall constitute the final agency action of DOT for all further proceedings in connection with this controversy.
With the above modifications, we adhere to our original decision and opinion, and the motion for rehearing is in all other respects denied.
REVERSED and REMANDED for further proceedings in accordance with this opinion.
BOOTH, J., concurs.
ERVIN, J., dissents with opinion.
ERVIN, Judge, dissenting.
I dissent. In view of the far-reaching effect the majority's decision will have on the competitive bidding process, I would certify the following question to the Florida Supreme Court as one of great public importance:
Is the standard of review, as stated in Liberty County v. Baxter's Asphalt & Concrete, Inc., 421 So.2d 505 (Fla. 1982), applicable to appellate review of agency orders involving competitive bid disputes which are appealed pursuant to Section 120.68, Florida Statutes?
NOTES
[1] The majority's reference to Section 120.53(5), Florida Statutes (1981), ante at 329, does not compel a conclusion that the standard for review in competitive bidding cases, arising from an administrative forum, is now different from the standard announced in Liberty County. Section 120.53(5) is a statute prescribing the procedure for adoption of rules for the purpose of resolving protests arising from the contract bidding process.
[2] United States Wood Preserving Company v. Sundmaker, 186 F. 678, 684 (C.C.A.Ohio 1911), states the following:

The submission by a reliable and responsible bidder, of the lowest bid for a contract for public work to an official whose duty it is under the statute to let the contract to the lowest and best bidder, but who has the right to reject any and all bids, of which fact the bidder is bound to take notice when and before his bid is submitted, does not constitute an agreement that the officer will make a contract with such bidder for the work; nor does it give the bidder such a right to the contract as will authorize a court of equity, at his instance, to compel the officer to enter into a contract for the work with him... .
[3] In DOT's final order, DOT stated that it could not "enter into a binding contract unless budget is available and the Department's comptroller certifies that sufficient funds are available. Section 339.135(8)(a), Fla. Stat. (1985)." That subsection precludes the department from entering "into any contract which ... involves the expenditure of money in excess of the amounts budgeted as available for expenditure during such fiscal year. Any contract ... made in violation of this subsection is null and void, and no money may be paid on such contract." (e.s.) The burden was on Grove-Watkins to establish that sufficient monies were budgeted to meet its bid. And, as the department's order reflects, "the only evidence submitted on this point was that the bids greatly exceeded the budget estimates."
[1] There have been three additional appeals or other applications to this court since G-W's filing of its notice of appeal in this case (BR-163) on December 30, 1986. G-W filed a petition for writ of prohibition (BR-410) on January 29, 1987, seeking to prevent DOT from soliciting rebidding on the project. The petition was denied pursuant to order issued on February 11, 1987, the same day on which the record in BR-163 was filed in this court. On April 3, 1987, G-W filed a second appeal (BT-37), seeking review of DOT's order dated March 31, 1987, dismissing without a hearing G-W's protest of DOT's March 23, 1987 notice of intent to award the contract for the project on rebidding to another contractor. On April 13, 1987, G-W filed a petition for unspecified extraordinary writ (BT-78), seeking to forestall DOT's continued activities leading to commencement of construction under a rebid contract. This petition for extraordinary writ was denied on April 24, 1987, but was ordered transferred to BR-163 to be treated as a motion for stay. DOT filed its response to the motion for stay (in BR-163), on May 4, 1987, alleging that the contract had been relet on April 8, 1987; that notice to proceed with construction was given April 24, 1987; and that work had begun on April 28, 1987. This court heard oral argument on the merits on May 12, 1987, and issued its opinion on June 11, 1987. An administrative order was issued by this court on June 30, 1987, granting G-W's motion to hold the appeal in BT-37 in abeyance pending the disposition of BR-163 on the merits. DOT filed its motion for rehearing in BR-163 on June 26, 1987, again alleging the reletting of the contract, and commencement of construction on the project on April 28, 1987. G-W filed its reply to DOT's motion for rehearing on July 6, 1987, calling to our attention, among other things, record evidence indicating that the project in dispute will take 1,052 days to complete.