424 So.2d 70 (1982)
AURORA PUMP, DIVISION OF GENERAL SIGNAL CORPORATION, a New York Corporation, Appellant,
v.
GOULDS PUMPS, INC., a Corporation and Jacksonville Electric Authority, a Body Politic and Corporate, Appellees.
No. AO-212.
District Court of Appeal of Florida, First District.
December 14, 1982.
*71 Charles T. Boyd, Jr., of Boyd, Jenerette, Leemis & Staas, P.A., Jacksonville, for appellant.
John B. Macdonald, of Franson, Brant, Dearing & Moore, Jacksonville, for appellee Goulds Pumps, Inc.
No appearance for appellee Jacksonville Elec. Authority.
WIGGINTON, Judge.
This appeal follows the final judgment of the lower court permanently enjoining Jacksonville Electric Authority (JEA) from entering into any contract for the work described as the St. Johns River Power Park General Centrifugal Pumps and arising out of its Invitation for Bids, and directing JEA, should it wish to proceed, to resubmit an invitation for bids with rules and regulations made equally applicable to all present and subsequent bidders. We affirm.
JEA promulgated and issued the Invitation for Bids and Instructions to Bidders in July, 1981, inviting bids for the manufacture of the general centrifugal pumps to be installed in the St. Johns River Power Park Units 1 and 2. Pursuant to the invitation, eligibility for bidding on the contract was limited to a list of seven pump manufacturers prequalified by JEA and included on JEA's "responsible bidder list." Bids were ultimately submitted by five bidders: appellee Goulds Pumps, Inc., appellant Aurora Pump, Worthington Pump Company, Allis-Chalmers Corporation, and Ingersole-Rand Corporation (whose bid was later declared non-responsive).
The bidding documents set forth the framework for a two-step bidding procedure. The instructions provided that the initial bids were to be submitted in two separate documents, a technical proposal and a cost proposal. As provided by paragraph M[1] of the instructions, the bidders' technical proposals would be opened first to permit evaluation of their content. Subsequent negotiations would then commence between JEA and each bidder regarding exceptions taken by the bidder to the technical and commercial terms of the proposed contract. During the evaluation and negotiation period the cost proposals would remain unopened. The Invitation for Bids further provided that bidders would be afforded an opportunity to submit plus and minus price adjustments to their still unopened cost proposals occasioned as a result of the negotiations on their exceptions to the technical and commercial terms of the proposed contract. Following the completion of technical evaluations and negotiations on the bidders' exceptions, the sealed cost proposals retained by JEA would then be opened, and the contract would be awarded to the lowest responsible bidder whose now opened cost proposal, plus or minus additions or deductions submitted in connection with the negotiations, offered the lowest fully evaluated cost for the contract.
The only published procedures and guidelines available to the bidders governing the manner by which bids were to be submitted, received, evaluated, or modified were contained in the Invitation for Bids and Instructions to Bidders, as supplemented by Ordinance 80-113-169 of the City of Jacksonville and JEA Procedure No. MD311. Although the invitation specified the date by which the initial technical and cost proposals were to be submitted, which as amended was September 29, 1981, neither it, the instructions, nor any other published material set forth the actual procedures utilized by JEA for conduct of the negotiations *72 regarding bidders' exceptions; methods by which the bidders could submit plus or minus price adjustments occasioned by those negotiations; or, most important, as we finally conclude, any deadline after which price adjustments could no longer be submitted. According to John Cole, JEA's project administrator responsible for the contract, the submission of price adjustments was governed by unwritten procedures based only on the customary practices of JEA.
Goulds, through one of its regional salesmen, Ernest Lary, prepared and submitted a bid before the initial "bid opening date" on September 29, 1981. At that time, Goulds' original cost proposal of $1,195,356 for Units 1 and 2 represented its most competitive price possible, considering the commercial terms of the contract initially proposed by JEA. Those initial terms required the bidders to be exposed to substantial financial risks should any one of them be awarded the contract. Although Goulds' initial cost proposal was computed assuming that the contract would be awarded on the terms proposed by JEA, in its technical proposal Goulds took exception to certain commercial contractual terms. Goulds' initial cost proposal included a cushion to compensate it for the financial risk it perceived those contractual terms would entail in the event Goulds was awarded the contract.
Subsequent to opening of the technical proposals on September 29, 1981, JEA's consulting engineers for the St. Johns River Power Park Project, Ebasco Services, Inc., commenced evaluation of the respective technical proposals and the bidders' exceptions to the original technical and commercial terms proposed by JEA. Negotiations between Ebasco and the respective bidders commenced informally in November, 1981, culminating in formal private negotiation meetings between JEA, Ebasco, and each respective bidder on December 15 through 17, 1981. As a result of communications with Ebasco, Goulds had resolved all of its exceptions to the technical specifications of the contract by the time of the formal meeting on December 16, 1981. However, its exceptions to the proposed commercial terms of the contract, which exceptions were included in the technical portion of the proposal, had not yet been resolved by that date.
Occasioned by the formal negotiations held on December 16, substantial changes to the proposed commercial terms of the contract were agreed upon by the parties, eliminating much of the previous financial risk to the ultimate contractor. Both JEA and Ebasco understood that as a result of the commercial changes Goulds was afforded an opportunity to assess the impact of such changes on its financial analysis of the proposed contract and to submit any resulting price modification to its cost proposal. Aurora, Allis-Chalmers, and Worthington all similarly understood that they were afforded the opportunity to submit price additions or deductions resulting from alteration of any commercial terms during their individual negotiations with JEA and Ebasco. However, Goulds interpreted the instructions to bidders, particularly paragraph J(1),[2] to provide for submission of price modifications so long as negotiations regarding the contract were continuing, but in any event before the cost proposals were opened.
The representatives of all bidders, including Goulds, knew that Ebasco would prepare a preliminary evaluation of the respective bids and transmit it to JEA. Computer projections based on the information contained in the preliminary evaluation would permit each bidder to estimate within a reasonable degree of certainty the amount of its competitors' respective cost proposals. Accordingly, JEA intended that all cost adjustments *73 were to be submitted no later than the date of the preliminary evaluation. The representatives of Worthington and Allis-Chalmers both knew the general time frame for preparation of the preliminary evaluation by Ebasco and therefore knew that all their price adjustments were required to be submitted prior to that date; however, they acted with that knowledge and understanding as the result of their personal familiarity with JEA's unwritten procedures and their individual experience in bidding on prior JEA contracts. Goulds had no prior experience in bidding on JEA's contracts and was thus not aware of the unpublished procedures governing the time for submission of price modifications. Although the preliminary evaluation was in fact completed and transmitted to JEA by Ebasco on January 26, 1982, Goulds alleges that it was neither advised of the completion of that evaluation nor provided a copy thereof.
Subsequent to the December 1981 negotiations, Goulds' home office personnel began their evaluation of the revised financial risk under the contract as it was affected by the extensive commercial changes negotiated. Although that evaluation was not completed until February 15, 1982, Goulds submitted preliminary cost deductions while it continued with its evaluation to keep negotiations active from its perspective. Goulds submitted a first deduction in the amount of $50,000 by a letter to Ebasco on December 22, 1981. A second deduction in the amount of $88,000 was delivered by letter to Ebasco dated January 11, 1982. Both of these deductions were accepted as tendered. Telephone conversations between Ernest Lary and representatives of Ebasco, coordinating evaluation of the respective bids, continued through January and into early February of 1982. Although Ebasco's preliminary evaluation had been transmitted to JEA on January 26, 1982, Ebasco continued thereafter to contact Goulds to determine whether an addition or deduction might be offered in the event further technical changes were made to specified pumps. Goulds thus believed that a continuing line of discussion remained open through early February, 1982, regarding potential changes to the contract which might precipitate still further authorized additions or deductions to the as yet unopened cost proposals.
The time for opening of the cost proposals was ultimately set for February 18, 1982. On February 16, Ernest Lary attempted to hand deliver a revised cost proposal, incorporating Goulds' final cost deduction, to the Purchasing Department of the City of Jacksonville, the authorized recipient of bids for JEA. This revised cost proposal, when considered in conjunction with the $88,000 deduction already submitted by their January 11 letter to Ebasco, yielded a final cost proposal of $950,424. However, the purchasing department refused to accept the revised cost proposal and on February 17, Lary attempted to hand deliver a letter proposing a final cost deduction of $244,932 to the city hall. This deduction superseded Goulds' prior revised cost proposal, but when applied to their original one of $1,195,356, yielded the same final cost proposal of $950,424 for Units 1 and 2. The deduction was also refused.
Finally, on the morning of February 18, 1982, prior to the opening of the cost proposals at 9:00 a.m., Goulds had a telegram delivered to JEA containing the above final cost deduction; but again, the deduction was refused. Thus, Ebasco's evaluation did not include Goulds' final cost deduction and concluded that Aurora was the lowest responsible bidder with a fully evaluated bid for the entire project of $6,953,063. Were JEA to have accepted the deduction offered by Goulds, however, Goulds' fully evaluated bid would have been $6,923,963, establishing it as the lowest responsible bidder for the contract.
At its regular meeting held on April 19, 1982, the JEA bid review committee recommended approval of the contract to Aurora. Goulds thereafter filed its complaint in the action below; and on April 20, 1982, the court entered a temporary restraining order subsequently superseded by the preliminary and then permanent injunctions. This appeal by Aurora followed.
*74 Aurora primarily contends that neither the Invitation for Bids nor the Instructions to Bidders authorized the modification attempted to be made by Goulds to its cost proposal, and that it would be error for a public authority to award a contract based upon a revised cost bid. Such an award, contends Aurora, would be in violation of the competitive bidding laws. Wester v. Belote, 103 Fla. 976, 138 So. 721 (1931); American Totalisator Co., Inc. v. Seligman, 384 A.2d 242 (Commw.Ct.Pa. 1977). On the contrary, Goulds submits that the bidding documents, specifically paragraph J(1),[3] clearly afford the bidders an opportunity to submit any price adjustments to their cost proposals precipitated by changes negotiated in either the technical specifications of the equipment required or the commercial terms of the contract to be awarded.
Notwithstanding, Aurora asserts Goulds' cost deductions neither specifically arose from negotiations on items of its technical proposal, nor bore a direct relationship to the negotiated changes to the commercial terms of the contract.[4] In response, Goulds maintains that both contractual changes affected the bidders' financial analyses of the contract as a whole, and in Goulds' case, could not be correlated to any specific dollar amount inserted in its original proposal. Nevertheless, Goulds repeatedly argues there existed no published guidelines or procedures available to the bidders which clearly specified the method and manner by which price adjustments were to be submitted.
Goulds distinguishes American Totalisator, relied on by Aurora, as involving circumstances under which one bidder was improperly allowed to revise a cost proposal with the foreknowledge of the pricing contained in his competitor's proposals. Rather, Goulds remains steadfast in its position that it submitted the final cost deduction without knowledge of the prices offered by the other bidders. Goulds maintains it was never provided a copy of Ebasco's preliminary evaluation or advised that the evaluation had been prepared until Goulds' final cost deduction had been submitted; under those circumstances, Goulds argues, it was not placed in an unfair advantage over any of the other competitors, including Aurora.
Although at times we may react to a party's position with raised eyebrows, it is not within this Court's realm of authority to reverse a lower court's well-reasoned opinion merely because we regard the successful party's position as highly improbable. The lower court's finding that neither JEA nor Ebasco advised Goulds that the preliminary evaluation had been submitted, or provided Goulds with a copy thereof, is supported by the record.
Yet, whether Goulds had knowledge of the evaluation, or of when it was submitted, is not the pertinent issue where the question is, in the first instance, whether the bidding documents were sufficiently specific to assure fair competition to all the bidders. Wester v. Belote, 138 So. at 723-724. The record supports the lower court's finding that both the invitation and the instructions were silent as to a specific procedure for conduct of the negotiations and as to a deadline by which cost proposal modifications resulting from the negotiations could be submitted. On the contrary, paragraph J of the instructions, and Ebasco's continuing line of communications with Goulds, which extended into the first week of February, *75 could reasonably have led Goulds to believe that negotiations would be honored until the opening of the cost proposals.
Regardless of whether all the other companies, including Aurora, understood that no modifications would be made after the evaluation was submitted, the other companies' operating their negotiations from a vantage obtained through prior dealings with JEA, worked to create the appearance of favoritism and impropriety. Further, had JEA accepted Goulds' eleventh-hour cost deduction, where the other companies believed last minute modifications were precluded by the instructions, Goulds would have received an unfair economic advantage. Liberty County v. Baxter's Asphalt & Concrete, Inc., 421 So.2d 505 (Fla. 1982).
Aurora argues that if Goulds was confused, it could have requested in writing an interpretation of the instructions; yet, Aurora's argument misses the point. Because of its lack of knowledge of the "unwritten rules," and due to its reasonable interpretation of the instructions, Goulds did not know it was "confused." Whether the deadline for submitting modifications was a date, or an event, as Aurora alleges, is irrelevant in this case where the instructions did not specify one or the other, and all involved apparently were unaware of the imbroglio.
Our holding today will not, as Aurora fears, encourage a bidder who feels that it is necessary to lower its cost bid, and who is precluded from doing so, to petition the courts to declare the bid documents ambiguous and to delay the process. Instead, those who we hope to encourage are the public agencies and authorities to responsibly prepare and disseminate clear and precise bidding instructions so the public may be protected against collusive contracts; to secure fair competition upon equal terms to all bidders; and to remove temptation for favoritism and fraud at the public expense. Wester v. Belote.
The lower court correctly concluded, under these circumstances, that JEA exercised its discretion in an arbitrary and capricious manner. William A. Berbusse, Jr., Inc. v. North Broward Hospital District, 117 So.2d 550 (Fla.2d DCA 1960). Accordingly, its final judgment is hereby AFFIRMED.
MILLS, J., concurs.
ERVIN, J., dissents with opinion.
ERVIN, Judge, dissenting.
I respectfully dissent. I disagree with the conclusion that the trial court was correct in finding that the JEA acted arbitrarily and capriciously in rejecting Goulds' untimely attempt at modification of its cost proposal and would therefore reverse the judgment in this case.
In my view the record fails to support a finding of arbitrary and capricious action on the part of the JEA. In its "Invitation to Bids", the JEA expressly reserved its right to "reject any or all bids in whole or in part with or without cause; or to accept the bid that, in its judgment, will be for the best interest of the Jacksonville Electric Authority." The JEA further reserved its right to reject any bids in which collusion was suspected or in which the prices were "unbalanced." Goulds' representative, Mr. Lary, acknowledged that such reservation gave the JEA or its consulting engineer, Ebasco, the power to refuse to consider any of the submitted proposals. Additionally, Lary testified that he understood Ebasco's evaluation of the proposals would be submitted to the JEA for use in making the final decision regarding the contract award.
The trial court, in its final judgment, found that it was "apparent that when the `evaluation' was made that no further changes in a bid were possible as the evaluation became a public document and anyone could take the evaluation and determine within a very narrow margin the amount of the competitor's cost bid... ." In light of that finding, the JEA could well have acted arbitrarily and capriciously if it had elected to accept Goulds' modified proposal. Finally, Goulds' representative admitted that he did not know when the bidding was to close. It was therefore incumbent upon him, pursuant to the terms of the Instructions to *76 Bidders, paragraph B, to seek an interpretation of those portions of the bidding documents which he did not understand. Goulds instead chose to rely on its own interpretation of paragraph J of the Instructions (cited at page five, ante, n. 2) and attempted to modify its original cost proposal at the eleventh hour.
It has long been recognized that public entities charged with the responsibility of awarding contracts for public works projects may exercise broad discretion in carrying out those duties. See William A. Berbusse, Jr., Inc. v. North Broward Hospital District, 117 So.2d 550 (Fla. 2d DCA 1960); 26 Fla.Jur., Public Works and Contracts § 22 (1959). The Florida Supreme Court has recently amplified upon this rule, observing that
... a public body has wide discretion in soliciting and accepting bids for public improvements and its decision, when based on an honest exercise of its discretion, will not be overturned by a court even if it may appear erroneous and even if reasonable persons may disagree.
Liberty County v. Baxter's Asphalt & Concrete, Inc., 421 So.2d 505 (Fla. 1982).
In this case, although "reasonable persons may disagree" with the JEA's refusal to accept Goulds' untimely modification of its cost proposal, such action was clearly within its discretion and did not amount to an arbitrary and capricious act. I would therefore reverse the trial court's entry of permanent injunction in this case.
NOTES
[1] Paragraph M provides:

"At the time and place announced for the opening of proposals, each technical proposal from a qualified bidder which has been received prior to the announced time for opening of proposals, except those which have been properly withdrawn, will be publicly opened. Cost proposals will be retained unopened until completion of technical evaluations and negotiations with respect to exceptions." (Emphasis added).
[2] Paragraph J provides in pertinent part:

"(1) Except as otherwise specified, a modification of a proposal already received will be considered only if the modification is received prior to the time announced for opening of proposals. All modifications except telegraphic shall be made in writing, executed and submitted in the same form and manner as the original proposal. Telegraphic modifications showing only add to or deducts from bid prices will be accepted. Telephone modifications will not be considered."
[3] Id.
[4] In support of its argument, Aurora points to language in the invitation, to wit:

Following the public opening of the technical proposal, such proposal, including all exceptions, will be evaluated with subsequent negotiations on those items of the technical proposal, both technical and commercial, requiring same, to include plus or minus price adjustments to the still unopened cost proposal;
and to paragraph E(2) of the instructions, which states:
(2) Technical and commercial exceptions to the proposed contract shall be clearly stated in each Bidder's technical proposal.
Negotiations will be limited to only those exceptions to the Bidding Documents which are clearly stated as such and included in that section of the proposal dealing with same.