ZEHMER, Judge.
We review by appeal a final order of the Department of General Services (Department or DGS) dismissing two bid protests filed by Caber Systems, Inc. That order adopted the hearing officer’s recommended order proposing approval of the Department’s rejection of all bids for the 1987 State micro-computer term purchasing contracts and extending the previous year’s contracts. The Department is subject to sharp criticism for failing to follow the time limits prescribed in section 120.53(5), Florida Statutes (1985), but we find no reversible error in the appealed order and affirm.
On December 15, 1986, Caber protested some of the awards the Department proposed to make pursuant to its invitations to bid on the micro-computer contract. After several meetings to discuss settlement of the protest, DGS determined that the invitation to bid was ambiguous and substantially flawed and, on January 21, 1987, gave notice of its intent to reject all bids. Caber immediately protested DGS’s rejection of all bids. After another settlement meeting with Caber, both of Caber’s protests were referred to a hearing officer on February 27, 1987. The protests went to hearing on March 13, 16, and 17,1987, and, pursuant to the parties’ request, proposed recommended orders were filed on or before April 13. The hearing officer entered his 25-page recommended order on May 13, 1987.
Caber presents two legal issues on appeal. The first questions whether the Department of General Services exceeded its statutory authority under section 120.-53(5)(c), Florida Statutes (1985), by summarily rejecting all bids after Caber had filed its protest of the awards (first protest) and had later filed a protest of the decision to reject all bids (second protest). *327 The second issue is whether the reasons underlying the Department’s decision to reject all bids were arbitrary and capricious, and not supported by competent, substantial evidence.
The hearing officer’s order, adopted by the Department’s final order, found the following facts:
“1. The Department of General Services (DGS), through its Division of Purchasing (Division), is the State agency responsible for establishing term contracts under which the DGS requires state agencies to purchase the commodities on such contracts and under which a county, municipality or other local public agency may purchase. State agencies, political subdivisions and local agencies purchasing under the State contract are exempt from competitive bid requirements for such purchases.
“2. The DGS surveys the State’s purchases of commodities and, if the volume of purchases of various commodities warrants, develops and bids term contacts [sic] for such commodities. The purpose of the term contracts is to obtain for the State the price advantages of large quantity purchases, to standardize the terms, conditions and technical specifications for commodities purchased by the State and to eliminate State agencies having to publish numerous individual invitations to bid. The Division’s objective should be to write specifications which allow for the widest participation of interested vendors and to obtain the greatest competition on pricing.
“3. In recent years, the DGS has established annual term contracts to make micro-computers available to state agencies, political subdivisions, and the state university system. The first annual term contract for micro-computers was established in 1979 or 1980. The bid specifications for the micro-computer contract have remained essentially the same since inception. Based on history, it can be estimated that contract users will expend approximately $38,000,000 in 1987.”
The hearing officer next found that “on August 29, 1986, DGS issued Invitation to Bid 545-250-040-B, Micro-computers (ITB) for purposes of establishing the 1987 term contract” and that the ITB classifies microcomputers in seven categories which are further broken down into some 55 subcategories based on specific makes and models of computers. The hearing officer’s findings of fact then continued:
“5. The Special Conditions of the ITB include a requirement for submission of price tables as part of a bid:
To be considered responsive, bidder must submit properly completed Tables A, B, C and D.... A complete set of Tables A, B, C and D must be submitted for each sub-category bid.
TABLE A — MICRO-COMPUTER HARDWARE COMPONENTS:
All hardware bid, whether mandatory or optional, must be entered in Table A. The sub-category, district and vendor must be indicated in space provided.
Table A must reflect only items applicable to the sub-category. A separate Table A must be submitted for each subcategory bid.
TABLE B — MICRO-COMPUTER OPTIONS/ACCESSORIES
All options, upgrades, and accessories must be entered in Table B. Accessories must identify microcomputer model(s) to which they are applicable. If there are no options, upgrades or accessories, so indicate with N/A.
TABLE C — SYSTEM SOFTWARE:
All system software, such as the operating system, editors, loaders, generalized utilities, etc., must be entered on Table C — System Software. Unit price of additional copies of documentation, if any, must be listed.
A separate Table C must be submitted for each sub-category bid.
TABLE D — EVALUATION CONFIGURATION:
Seven basic configurations will be considered in making awards. The configurations are designated Category 1 through 7 and are shown in Table D1 through D7. Care should be taken in completion of Table D since incorrect information could result in disqualification. In case of errors in Table “D”, prices in *328 Tables A, C, shall prevail. State reserves the right to correct arithmetic errors in Table “D”.
To qualify for award, any system must, as a minimum, satisfy the evaluation configuration specified in Table D.
Manufacturer Name and Model: Enter sub category (listed in Table I of specifications) being bid plus the name and model of the system.
If there is no charge for a component, so indicate with N/C.
Components and prices listed by vendors in Table D must agree with components and prices listed in Tables A and C.
Use separate Table D for each sub-category.
“The Special Conditions also state: ‘Any contract resulting from this bid will be awarded by sub-category to the low bidder.’
“6. Historically, awards were made by make and model, using a format substantially like the current ITB format for the invitation to bid. Within each subcategory, DGS evaluated the various makes and models by price. Significantly, this was done even if the sub-category description was not ‘Other Low Qualifying Bids’ and did not include words like ‘all models’ or ‘series.’ If there were more than one bid on a particular model, the award would be to the lowest bidder. If only one bid was received on a particular model, the award would be made to that bidder. In order to be considered responsive, a bidder had only to submit one responsive Table D per subcategory. Once it was determined that the bidder had submitted a responsive Table D, the individual models listed on Table A would be evaluated and considered for award. As a result, the contract currently in place has approximately 200 to 250 microcomputers; the ITB last year listed only 48 subcategories.
“7. The past practice of DGS was to award accessories to each vendor who was awarded a model, thereby creating competition for acquistion of accessories within the contract. For example, if three different models were awarded to three different bidders in one subcategory in the 1986 contract, each bidder would also be awarded the accessories listed on its Table A. (In 1985, Table A incorporated both Table A and Table B of the ITB in issue in this case.) A state agency would purchase accessories from the vendor with the lowest price. Historically, state agencies have been required to purchase accessories awarded under the contract. The same scenario was true for the software. The bidders who were awarded a model in the 1986 contract would be awarded the software they had listed on Table B (Table C in the ITB in issue in this case), and state agencies who are required to purchase from the contract could choose the lowest prices.
“8. The ITB in issue in this case was sent to 258 vendors, of whom 67 responded.
“Some, mostly the manufacturers, including Apple and IBM, responded to the bid in accordance with past practice. They did not interpret the ITB to require a separate Table D for each model bid, just a separate Table D for each subcategory. They also structured their bids with the understanding that all models on Table A would be considered for award and that there would be more than one award per. subcategory (even if the subcategory description was not ‘Other Low Qualified Bid’ or the new ‘100% IBM Compatible Clone’ and did not include words like “all models” or ‘series.’)
“Other bidders, mostly dealers, including Caber and Mini Computer, who were not as familiar with the history of the microcomputer bidding process, interpreted the ITB to require a separate Table D for each bid, not just for each subcategory. Mini Computer strictly interpreted the ITB to provide for only one award per subcategory. Caber’s interpretation was that multiple awards were contemplated by the ITB only in the subcategories described ‘Other Low Qualified Bid’ or ‘100% IBM Compatible Clone’ and in other subcategories whose descriptions included the words ‘all models’ or “series.”
“As for accessories and software, Caber and Mini Computer did not read the ITB to provide for any award of accessories on *329 Table B or software on Table C. They thought Tables B and C were for informational purposes only and that there would be no requirement for users of the resulting contract to buy accessories or software from the contract.[1] There was no evidence tending to show whether the other bidders thought there would be an award of accessories or software or how they would be awarded.
“9. The responses to the ITB were opened on October 9, 1986. As was DGS’ custom, the Table D prices only were tabulated. Among other things, the tabulations showed that Caber’s Table D prices in subcategories 2A and 5B were lower than Apple’s or any other bidder’s.
“10. DGS then began the process of evaluating the bids and making awards. Based on the historical response, DGS allotted three weeks for evaluation and award. But due to the unusual number of bidders and bids, the process took ten weeks.
“11. After the tabulation but before the posting of awards, Caber informed some fellow Apple dealers that Caber was the low bidder in subcategories 2A and 5B and would be getting the 1987 state term contract. The word spread among the Apple dealers and customers in Florida, and some concerned Apple dealers and customers contacted Apple, asking if it was true that Caber was going to have the 1987 contract. To clarify the question, among other things, Apple scheduled a meeting with the DGS in early November, 1986. Apple was assured that DGS intended to evaluate the bids by make and model and make awards to the lowest bidder of each make and model, as usual, including all models bid under subcategories 2A and 6B.
“12. On December 15, 1986, DGS posted awards. On receipt of the posting, Caber noticed that DGS had designated its previously tabulated Table D price in Subcategory 2A as the ‘Professional System,’ added three prices to Apple’s previously tabulated 2A price — designated ‘Starter System,’ ‘3.5 Starter System’ and ‘Color Classroom System’ — and awarded all four under 2A. Similarly, DGS had designated Caber’s and Apple’s previously tabulated Table D prices in Subcategory 5B as the ‘Starter System,’ added a Caber price designated ‘CPU,’ added an Apple price designated ‘Color System,’ and awarded the ‘Starter System’ and ‘CPU’ to Caber and the ‘Color System’ to Apple. Caber arranged to further investigate the awards.
[[Image here]]
“15. In late December, 1986, Caber protested the three awards to Apple in Subcategory 2A, three awards to IBM in Subcategory 3A, one award to Apple in Subcategory 3D, one award to Microage in Subcategory 3L, seven awards to Microage in Subcategory 3M, two awards to IBM in Subcategory 4C, the award to Apple in Subcategory 5B, six awards to Microage in Subcategory 7A, and one award to IBM in Subcategory 7B.
“16. Caber’s definition of ‘model’ seemed to also be at variance with the way DGS had interpreted that term. DGS viewed a model as the model number by which the manufacturer identified a part or a particular configuration. Caber viewed the type of computer as the model and any variation from the basic computer as an assemblage for marketing purposes even though the manufacturer may identify the assemblages by different model numbers. For example, in Subcategory 2A, Apple He, DGS viewed the Starter System, the 3.5 Starter System, and the Color Classroom System as models within the subcategory. Caber viewed Apple He as the model, meaning there was only one model in Subcategory 2A. In Subcategory 3A, IBM PC Series, DGS viewed the subcategory to be divided into series consisting of PC, XT, XT 286, and 3270 PC and the series to be further divided into models. Caber viewed the PC, XT, XT-286 as models rather than series.
“17. Each of the three additional models awarded to Apple in Subcategory 2A— the Starter System, 3.5 Starter System and Color Classroom System — are single diskette drive systems, whereas Subcategory 2A specifies a two diskette drive system. Each of the three additional ‘models’ awarded to Apple in Subcategory 2A meet *330 the specifications of Subcategory 1C, Other Low Qualified Bid. But it was DGS’ intent for those models of the Apple He to be bid under Subcategory 2A, Apple He, as historically had been done, not under Subcategory 1C, Other Low Qualified Bid.
[[Image here]]
“19. Under the interpretation of the award of Table A items offered by Caber at the hearing, and of the award of Table B and C items offered post-hearing, Table A, B and C items would not be evaluated, but would be awarded along with the award for the lowest Table D price. Using Subcategory 2A as an example, this would, as a practical matter, result in the award of Starter System, 3.5 Starter System and the Color Classroom System to Caber, along with the Professional System in its Table D, because Caber could put those system models together from its Table A, B and C items. But the price of those additional system models put together from Caber’s Tables A, B and C would be higher than the prices Apple bid for them in its Table A. Since only about 10% of the State’s Apple He purchases in 1986 were Professional Systems, the price differences are significant. Taking the Color Classroom System alone, approximately 60% of the State’s 10,000 Apple He purchases in 1986 were Color Classroom Systems. At a price difference of approximately $150 per sale, it would cost the State approximately $900,-000 more to buy those same systems from Caber in 1987. Similarly, Caber’s Starter System would cost contract users $965 compared to Apple’s bid of $827, and Caber’s 3.5 Starter System would cost contract users $1050 compared to Apple’s bid of $878. This, too, would not be in the best interest of the State.
“20. Also, under the interpretation of the award of Table B accessories offered by Caber post-hearing, although a wider variety of accessories would be available than under the strictest interpretation of one award per subcategory, winner take all, accessories would be available from somewhat fewer vendors. This reduces the incentive of bidders to price Table B accessories competitively and increases the likelihood that higher prices will be paid by contract users. Since accessories are now approximately 40% of the State’s purchases, it is in the best interests of the State to structure the bid to foster price competition for accessories if accessories are not to be separately evaluated.
“21. Subcategory 5B is the Apple lie. The December 15, 1986, posting recommended awards to Caber for the Apple lie CPU and the Apple lie Starter System. The posting recommended an award to Apple for the Apple lie Color System. Apple submitted a Table D for category 5B which met the minimum evaluation configuration. The Apple lie Color System is a model within the Apple lie series, as ‘model’ is defined by Apple, as manufacturer, and by DGS, although this definition is not spelled out in the ITB. Caber defines the Apple lie as the microcomputer model. Apple bid the Apple lie Color System which includes the more popular color monitor rather than the monochrome monitor bid by Caber.
[[Image here]]
“24. The DGS did not include the words ‘no substitutes’ in the ITB. (See Rule 13A-1.002(16), Florida Administrative Code (1986).) Meanwhile, the ITB does include General Condition 6:
MANUFACTURERS’ NAME AND APPROVED EQUIVALENTS: Any Manufacturers’ names, trade names, brand names, information and or catalog numbers listed in a specification are for information and not intended to limit competition. The bidder may offer any brand for which he is an authorized representative, which meets or exceeds the specifications for any item(s).... If bids are based on equivalent products, indicate on the bid form the manufacturer’s name and number. Bidder shall submit with his bid, cuts, sketches, and descriptive literature and/or complete specifications. Reference to literature submitted with a previous bid will not satisfy this provision. The State of Florida reserves the right to determine acceptance of item(s) as an approved equivalent. Bids which do not comply with these requirements are subject to rejection. Bids *331 lacking any written indication of intent to bid an alternate brand will be received and considered in complete compliance with specifications as listed on the bid form. The Division of Purchasing is to be notified of any proposed changes in (a) materials used, (b) manufacturing process, or (c) construction. However, changes shall not be binding upon the State unless evidenced by a Change Notice issued and signed by the Director, Division of Purchasing.
“But the general condition appears on a form cover sheet while this ITB is for a multiple award. A reasonable interpretation of this ITB, taken as a whole, is that subcategories described by specific manufacturers and models call for a bid of the specific manufacturer’s products and that so-called ‘third party components’ can be bid only in subcategories described as ‘Other Low Qualified Bid’ or ‘100% IBM Compatible Clone.’ Otherwise, it would be very difficult, if not impossible, to compare and evaluate bids in the various subcategories. But the ITB is ambiguous on the use of ‘third party components.’
“25. Although IBM listed third party components on its Table Bs (optional hardware) in its bid, Apple and the DGS interpreted the ITB to restrict the use of ‘third party components’ to subcategories described as ‘Other Low Qualified Bid’ or ‘100% IBM Compatible Clone.’ As a result of this interpretation, Apple did not include BASIC in its bid in Subcategory 3D. DGS posted the award of the Apple Macintosh to Apple, as low bidder, instead of Caber, as second low bidder. But actually, under the DGS interpretation, Apple’s bid using ‘third party’ BASIC was unresponsive, and the specifications were written so as to preclude Apple, the manufacturer, from bidding its own Apple Macintosh. Such a result would not be in the State’s best interest.
[[Image here]]
“32. The facts show that the ITB was seriously flawed in several respects. First, it neither reflects the DGS intent and historical practice to award by make and model under all subcategories nor clearly and unambiguously reflects any other intent, such as either the intent Caber or the intent Mini Computer inferred from the ITB. Second, it neither provides for evaluation of Table B accessories or Table C software nor clearly provides that awards of Table B accessories or Table C software will be made. Third, the ITB is ambiguous on the use of ‘third party components.’ And fourth, if ‘third party components’ are not allowed in most subcategories, Subcategory 3D is written so as to preclude Apple from bidding on its own Apple Macintosh.[2]
“33. As a result of these flaws, Caber, which, like all of the bidders, had invested substantial time, money and energy responding to what it thought the ITB said, understandably reacted with some degree of indignation and suspicion to some of the awards DGS posted using its interpretation of the ITB.
“34. Meanwhile, DGS’ personnel, who also had invested substantial time, money and energy in the ITB process (especially the 10 week evaluation process) on behalf of the State, understandably reacted with some degree of annoyance, disappointment and dejection when Caber’s December, 1986, protest made it inescapably apparent that the ITB had serious flaws that promised to make life very difficult for the DGS, and particularly for those involved in the ITB process.
* * * * * * *
“36. General Condition 9 of the ITB provides:
AWARDS: As the best interest of the State may require, the right is reserved to make award(s) by individual item, group of items, all or none, or a combination thereof, on a geographical district basis and/or on a statewide basis with one or more suppliers to reject any and all bids or waive any minor irregularity or technicality in bids received. When it is determined there is competition to the lowest responsible bidder, evaluation of other bids is not required. Bidders are cautioned to make no assumptions unless their bid has been evaluated as being responsive. All awards made as a result *332 of this bid shall conform to applicable Florida Statutes.
“37. On balance, the evidence convincingly proved that it is in the State’s best interests to reject the bids in subcategories 2A, 3D, 4C and 5B, correct the flaws in the ITB and re-bid those subcategories, possibly with additional subcategories.
“38. The evidence was less convincing on the question whether it is in the State’s best interest to reject the bids in the other 52 subcategories. But there was proof:
One of the things when we began this part of the evaluation that became clear to us was the fact that the bidders responded in two distinct different ways. We had a group of bidders that responded with a literal interpretation of our evaluation and award statement that said we were going to award by the lowest price per subcategory. And we had probably a larger group of people that had historically participated in the bid that responded by make and model, which is how we evaluated the bid and how we have historically awarded the bid.
* * * * * * *
I think the other thing that has come to light in our meetings is simply the fact that if I as a bidder conditioned by bid knowing that historically you’ve awarded by make and model, and you have my bid and you’ve evaluated it and you’ve found me responsive, but all of a sudden now we find that we can’t award it that way, or, even worse, we say we have to award it the way Caber intends, I would say that’s unfair to me. You’re evaluating my bid differently than what my intent and understanding was when I submitted it.
On the other hand, if indeed, as Mini Computer did, I looked at it and I took a literal interpretation, and the State has evaluated it by make and model, that’s not fair to him.
So what I would say is that unfortunately we have spent a lot of time administratively, manpower, and so have the vendors. But it’s an insolvable situation that can best be remedied by rejection of the bids, correcting the language, correcting the specifications, and going forward with a new bid, turning it around and getting a new contract into place.”
Testimony of George Banks, TR. 345 and 374-375.
“39. Besides the question of fairness to all the bidders, there is the question of fairness to the State. It is possible, though not proved by the evidence, that the confusion in the ITB worked to reduce price competition by make and model because some bidders either thought only one award would be made per subcategory (as Mini Computer did) or thought that all makes and models in a bid response in a subcategory would be awarded on the basis of the prices in the Table D only (as Caber did), allowing the bidder to ‘low-ball’ Table D and ‘high-ball’ other components on Tables A, B and C (including accessories.)
“40. Under all the circumstances which the evidence shows surround this ITB, it cannot be said that a decision to reject all bids is without any rational basis, is arbitrary or is capricious.”
(R. 364-376).
The hearing officer’s conclusions of law adopted in the Department’s final order included the following:
“1. Section 287.001, Florida Statutes (1985), provides:
287.001 Legislative intent. — The Legislature recognizes that fair and open competition is a basic tenet of public procurement; that such competition reduces the appearance and opportunity for favoritism and inspires public confidence that contracts are awarded equitably and economically; and that documentation of the acts taken and effective monitoring mechanisms are important means of curbing any improprieties and establishing public confidence in the process by which contractual services are procured. It is essential to the effective and ethical procurement of contractual services that there be a system of uniform procedures to be utilized by state agencies in managing and procuring contractual services; that detailed justifica *333 tion of agency decisions in the procurement of contractual services be maintained; and that adherence by the agency and the consultant to specific ethical considerations be required.
“2. Section 120.53(5), Florida Statutes (1985), prescribing procedures for bidding, provides in pertinent part:
(c) Upon receipt of a notice of protest which has been timely filed, the agency shall stop the bid solicitation process or the contract award process until the subject of the protest is resolved by final agency action, unless the agency head sets forth in writing particular facts and circumstances which require the continuance of the bid solicitation process or the contract award process without delay in order to avoid an immediate and serious danger to the public health, safety, or welfare. (Emphasis added.)”
But neither the statute nor the court decisions prohibited the DGS from rejecting all bids or required the DGS to postpone a decision to reject all bids until after Caber’s protest of the December 15, 1986, posting of awards was resolved by final agency action. In Cianbro Corp. ¶. Jacksonville Transp. Auth., 473 So.2d 209 (Fla. 1st DCA 1985), the court stayed the award of a contract during the pendency of bidders protests.[3] In Solar Energy Control, Inc. v. Dept, of Health and Rehabilitative Services, 377 So.2d 746 (Fla. 1st DCA 1979), the court stayed the re-bidding of a contract during the pendency of a bidder’s protest of the agency’s rejection of all responses to the initial invitation to bid. In this case, DGS’ procedures have resulted in one administrative proceeding to resolve efficiently both Caber’s protest of the December 15, 1986, posting of awards and its protest of the January 21,1987, rejection of all bids. No further bidding or award of contracts will take place until after the resolution of this proceeding. Caber cannot use Section 120.53(5)(c) or the court decisions either as a means of delaying the resolution of its protests by requiring their consideration in two separate, consecutive administrative proceedings or as a sword to cut off DGS’ ability to consider whether to reject all bids.
“3. Section 120.5S(5)(d), Florida Statutes (1985), also provides in pertinent part:
(d) The agency, on its own initiative or upon the request of a protestor, shall provide an opportunity to resolve the protest by mutual agreement between the parties within 7 days, excluding Saturdays, Sundays, and legal holidays, of receipt of a formal written protest.
* * * * * * *
2. If the subject of a protest is not resolved by mutual agreement within 7 days, excluding Saturdays, Sundays, and legal holidays, of receipt of the formal written protest and if there is a disputed issue of material fact, the agency shall refer the protest to the division for proceedings under s. 120.57(1).”
In this case, DGS did not refer Caber’s protest of the December 15, 1986, posting until February 27,1987, when it referred to the Division of Administrative Hearings both that protest and Caber’s protest of the January 21,1987, rejection of all bids. The delay in referring the first protest technically violated the procedures set out in Section 120.53(5)(d). But the error did not prejudice Caber. Referral of the first protest to the Division of Administrative Hearings legally would not have prevented DGS from later rejecting all bids. See Conclusion 2, immediately above.
“4. The evidence was clear that DGS gave Caber ‘an opportunity to resolve [both of Caber’s protests] by mutual agreement.’ Settlement meetings were held on January 5 and again on February 12, 1987. The evidence did not prove that either DGS or Caber negotiated in bad faith but only that the parties were unable to agree to a resolution of either of the protests and that there were hard feelings on both sides. See Findings 33 and 34, above.
“5. Rule 13A-1.002, Florida Administrative Code (1986), provides that an agency shall reserve the right to reject any and all bids and shall so indicate in its invitation to bid.
“General Condition 9 of the ITB, DGS expressly reserved the right ‘as the best interest of the state may require’ to award *334 by individual items or groups of items or to reject any and all bids or waive any minor irregularity or technicality.
“6. Notwithstanding Rule 13A-1.002 and General Condition 9, the courts have held that an agency’s authority to reject all bids is not unbridled. An agency’s rejection of all bids may not be arbitrary or capricious; But, otherwise, an agency has wide discretion to reject all bids. See Liberty County v. Baxter’s Asphalt and Concrete, Inc., 421 So.2d 505 (Fla.1982); Cape-letti Bros., Inc. v. Dept, of General Services, 432 So.2d 1359 (Fla. 1st DCA 1983); Couch Constr. Co., Inc., v. Dept, of Transp., 361 So.2d 172 (Fla. 1st DCA 1978); Woods [Wood] Hopkins Contracting Co. v. Roger J. Au & Sons, Inc., 354 So.2d 446 (Fla. 1st DCA 1978).
“7. A formal administrative proceeding under Section 120.57(1), Florida Statutes (Supp.1986), arising out of the protest of an agency decision to reject all bids is de novo in the sense that the issue whether the agency decision to reject all bids has a rational basis or is arbitary and capricious is decided upon evidence of facts and circumstances at the time of the final hearing. See Couch Const. Co., Inc. v. Dept, of Transp., supra, at 175-176.
[[Image here]]
“10. As found, the DGS decision to reject all bids in this case has a rational basis. It is not arbitrary or capricious. It is apparent, for example, that DGS intended to award by make and model but the invitation to bid did not reflect its intent clearly. Some bidders prepared their bids based upon the historical method of award, and others followed more literal readings of the invitation to bid. Thus, the specifications did not adequately apprise the bidders of the method of award that would be used. Contracts procured through competitive bidding ‘should be predicated upon adequate specifications which afford some reasonable basis for a comparison of bids, in order that bids, when received, might be truly competitive in characer by having them applied to the same things.’ Wester v. Belote, [103 Fla. 976] 138 So. 721, 724 (Fla.1931).
“The facts in this case are similar to the facts in Aurora Pump v. Goulds Pumps, Inc., 424 So.2d 70 (Fla. 1st DCA 1982). In Aurora, the Jacksonville Electric Authority (JEA) had issued an invitation to bid for centrifugal pumps. The invitation to bid did not address procedures which would be used in negotiating price adjustments to the bids; however, the price adjustments were governed by unwritten procedures based on the customary practices of JEA. Goulds Pumps, relying on his interpretation of the invitation to bid, submitted his proposal after the submission of a preliminary evaluation by the engineers to JEA; however, according to past practices, JEA did not accept price adjustments after the submission of the preliminary evaluation. The other bidders were aware of the unwritten deadline for submission of cost adjustments. In an appeal arising out of a circuit court judgment enjoining the JEA from entering into a contract with Aurora Pump, the court appreciated the dilemma caused by the inconsistencies between the past practices and the bid solicitation document.
[T]he question is, in the first instance, whether the bidding documents were sufficiently specific to assure fair competition to all the bidders.
* * * * * *
Regardless of whether all the other companies, including Aurora, understood that no modifications would be made after the evaluation was submitted, the other companies’ operating their negotiations from a vantage obtained through prior dealings with JEA, worked to create the appearance of favoritism and impropriety. Further, had JEA accepted Goulds’ eleventh-hour cost deduction, where the other companies believed last minute modifications were precluded by the instructions, Goulds would have received an unfair economic advantage. Liberty County v. Baxter’s Asphalt & Concrete, Inc., 421 So.2d 505 (Fla.1982).
Aurora argues that if Goulds was confused, it could have requested in writing an interpretation of the instructions; yet, Aurora’s argument misses the point. *335 Because of its lack of knowledge of the ‘unwritten rules,’ and due to its reasonable interpretation of the instructions, Goulds did not know it was ‘confused.’ Whether the deadline for submitting modifications was a date, or an event, as Aurora alleges, is irrelevant in this case where the instructions did not specify one or the other, and all involved apparently were unaware of the imbroglio.
“Id. at 74, 75. The court affirmed the injunction against JEA from entering into any contract and directed JEA to rebid if it desired to proceed with the work. In so holding, the court stated:
[TJhose who we hope to encourage are the public agencies and authorities to responsibly prepare and disseminate clear and precise bidding instructions so the public may be protected against collusive contracts; to secure fair competition upon equal terms to all bidders; and to remove temptation for favoritism and fraud at the public expense. Wester v. Belote.
The lower court correctly concluded, under these circumstances, that JEA exercised its discretion in an arbitrary and capricious manner. William A. Ber-busse, Jr., Inc. v. North Broward Hospital District, 117 So.2d 550 (Fla. 2d DCA I960).”
Id. at 75.
“In this case, to award by make and model treats the bidders who submitted bids according to one of the more literal readings of the ITB unfairly. On the other hand, to award by one of the stricter readings of the ITB is unfair to those bidders who submitted bids based on DGS’ past practices. Therefore, on the authority of the Aurora decision, not only was the DGS decision to reject all bids neither arbitrary nor capricious, it may have been arbitrary and capricious for DGS not to have rejected all bids.
“11. The decision in the Final Order, Douglas Printing Co., Inc., v. Dept, of Agriculture and Consumer Services, 5 F.A.L.R. 2225-A (Dept.A. and C.S.1983), while somewhat confusing, might seem on first reading to conclude that all bids cannot be rejected after the bids are opened and considered. But on closer reading, the decision is distinguishable from the facts of this case. The decision notes: ‘In the instant case, there was no showing of any reason for rejection of all bids other than that the Director felt an inadequate number of bids had been received.’ Id. at 2227-A. There was no reason to wait until after bid opening to reject all bids on that ground. To the contrary, in this case the DGS did not know the grounds for rejection of all bids until after the December 15, 1986, posting.”
"1 Notwithstanding the clear testimony of Caber’s president, Richard Evans, that this was how Caber interpreted the ITB at the time, Caber disingenuously argued in its proposed recommended order for a contrary ‘subcategory winner take all criterion of award.’ ”
“2The ITB also does not define options, upgrades, or accessories. Bidders were confused whether to use Table A or B when listing some of the various components that were also to be listed in Table D. Table A called for all hardware whether mandatory or optional, and Table B called for all options, upgrades, and accessories. Some bidders felt that some of the components listed on Table D were considered accessories so they listed the components in Table B rather than Table A. Although the ITB required that the prices in Table D be verified by the price lists in Tables A and C, DGS also used Table B to verify prices listed in Table D because of the apparent confusion of the bidders. The specifications, however, said that DGS would not use Table B for this purpose.”
"3 Incident to that decision, the court considered the transportation authority’s argument that proceeding with the award process was necessary to avoid additional cost and delay if all bids automatically were rejected upon the expiration of 120 days after the opening of the bids, as provided in the bid specifications. 473 So.2d at 213-214. In dicta, the court stated: ‘We have serious reservations as to the propriety of this provision. Initially, we question whether by setting a deadline of 120 days for award of contracts, JTA can avoid a contract award protest and simply rebid the project.’ 473 So.2d at 214. But in this case, DGS does not base its rejection of all bids on an arbitrary time deadline."
(R. 376-383)
The hearing officer’s findings of fact are supported by competent, substantial evidence of record, and we find no reversible error in his conclusions of law as adopted by the Department’s final order.
*336 We find no merit in Caber’s first point, that DGS exceeded its authority under section 120.53 by rejecting all bids after Caber had filed its protests. The pertinent language in section 120.53(5)(c) provides that “the agency shall stop the bid solicitation process or the contract award process until the subject of the protest is resolved by final agency action.” We construe this language, as does the Department, to mean that the Department could not continue the bidding process leading toward the award of any contract to other bidders until a bidder’s protest had been resolved, but not that the Department was also precluded from immediately rejecting all bids and initiating a new ITB upon discovery of valid grounds for doing so. Therefore, when Caber’s first protest revealed serious flaws in the ITB which ultimately required the Department to reject all bids (for reasons we hold were neither arbitrary nor capricious), the pendency of that protest did not deprive the Department of authority to act upon this deficiency in rejecting the bids. There is no limitation in the statutory language restricting the Department’s power to immediately reject all bids and start the bid process anew with a valid ITB, rather than locking up the entire process pending hearing on the protest so that nothing could proceed. Once DGS had decided to reject all bids for the reason specified, to first await the outcome of a hearing on Caber’s first protest before taking action would be a complete waste of time and taxpayers’ money. Of course, once the decision to reject all bids was announced, Caber was entitled to protest it, as it did, and have the validity of the Department’s decision submitted to a hearing under section 120.57. See Couch Construction Co. v. Department of Transportation, 361 So.2d 172 (Fla. 1st DCA 1978). After the Department’s decision to reject had been heard by a hearing officer pursuant to Caber’s second protest and determined to be valid under the applicable law, the Department’s final order rejecting all bids became fully effective, thus freeing the bidding process to immediately begin anew, absent a stay of that final order.
The hearing officer’s recommended order correctly ruled that rule 13A-1.002(9), Florida Administrative Code, and implementing contract provisions allowing it to reject all bids, do not permit the Department to arbitrarily bypass all statutory procedures for resolution of bid protests; for the Department’s decision must be founded upon a rational basis and not be arbitrary. See, e.g., Cianbro Corporation v. Jacksonville Transportation Authority, [two cases reported consecutively] 473 So.2d 206 and 209 (Fla. 1st DCA 1985); Solar Energy Control, Inc. v. State, Department of Health and Rehabilitative Services, 377 So.2d 746, 747-748 (Fla.lst DCA 1980); Couch Construction v. Department of Transportation, 361 So.2d 172, 175 (Fla. 1st DCA 1978).
In the earliest of these cases, Couch Construction Co., supra, the Department of Transportation had rejected Couch’s bid because it did not send a representative to the pre-bid conference as required by the bid documents, notwithstanding that DOT had discontinued all mandatory pre-bid conferences. After recognizing the bidder’s right to a 120.57 hearing on its protest, the court held that DOT’s rejection of all bids to avoid litigation by Couch and other contractors did not satisfy the requirements of chapter 120, explaining:
We affirm that the Department has wide discretion to reject all bids and to call for new bids for public contracts. [Citations omitted.] In making such a determination, the Department cannot act arbitrarily. The Administrative Procedure Act requires that the Department’s decision be by a final order that takes account of countervailing evidence and argument....
The recommended order of the DO AH hearing officer ... and the Department’s final order adopting it April 25,1978, are inadequate by Chapter 120 standards .... In December the Department thought to avoid controversy and delay by rejecting all bids. Appeasement and expediency are rarely fruitful as government policies, and they were not in this case; the Department obviously and erroneously assumed that the bids could be *337 rejected without accountability under Chapter 120. So, acting without affording Couch at least an immediate Section 120.57(2) hearing, and consequently without an order expounding the agency’s exercise of discretion in the light of events as then understood by the agency, the Department created an opportunity for subsequent events to reveal the folly of rejecting all bids to avoid controversy and litigation.
* * * * * *
The rejection of all bids, however, on the grounds of failure of the low bidder to attend that conference was not re-evaluated in light of the same circumstances. The final order conspicuously fails to evaluate the Department’s December rejection of bids in light of the facts shown at the Section 120.57 hearing.
361 So.2d at 175-76. The court, however, stopped “short of holding that the Department may not now rationally reject all December bids” and remanded to DOT for entry of a new final order “which explains and defends its decision.” (361 So.2d at 176.)
In Solar Energy Control, supra, after a timely protest was filed, the agency rejected all bids without affording a section 120.-57 hearing on the protests. This court held:
Respondent basically claimed the right, under duly promulgated rules and its own purchasing and policy procedures, to reject any and all bids.
Respondent urges that this court ought not to sanction proceedings which would impinge upon the broad discretion vested in an administrative agency in carrying out its functions with respect to the awarding of public contracts.... Our review of the petition, the attachments, and the response, in the light of the arguments made and authorities cited, leads us to the conclusion that the petition set forth a set of facts which are sufficient, in our view, to require that petitioner be afforded a hearing, under Section 120.57, on its claim to be awarded the contract pursuant to its bid, and to further warrant an order of this court affording the rather drastic remedy of halting all further rebidding procedures pending the outcome of that hearing. These measures are particularly appropriate in this case because, in addition to petitioner’s claims that the rejection of its bid and call for new bidding was arbitrary and capricious, there are additional allegations that the decision by the responsible officer of respondent, to reject bias and order rebidding, was infected with personal considerations of such a nature as to raise serious questions concerning the integrity of the entire bidding process.
377 So.2d at 747-48 (emphasis added).
In Cianbro Corp., supra, the Jacksonville Transportation Authority sought to avoid the section 120.53 mandatory stay following a bid protest by invoking the statutory exception for “immediate danger to the public health, safety, or welfare.” JTA referred to a provision in the bid solicitation document reciting that all bids would be rejected unless the contract was awarded within 120 days of bid opening as one of the reasons supporting the alleged immediate danger to health, safety and welfare. Rejecting the legal sufficiency of this reason to support JTA’s position, this court said:
JTA argues that is this self-imposed deadline is not met, the contracts would have to be rebid with the accompanying cost and delay. We have serious reservations as to the propriety of this provision. Initially, we question whether by setting a deadline of 120 days for award of contracts, JTA can avoid a contract award protest and simply rebid the project. This “escape clause” may not be utilized to circumvent the procedures set forth in Section 120.53, governing bid protests. If that were the case, the agency could simply avoid a bid or contract protest by setting an arbitrary date on which all bids not awarded would be deemed rejected. In Solar Energy Control, Inc. v. State of Florida, Department of Health and Rehabilitative Services, 377 So.2d 746 (Fla. 1st DCA 1979), we intimated that an agency could not *338 use its supposed power to “reject any and all bids” as a device to avoid bid protest proceedings and cut off a bidder’s right to an administrative remedy. Regardless of the propriety of the 120 day clause in the instant case, we find that it does not demonstrate a fact or circumstance which would threaten the public health, safety or welfare.
473 So.2d at 214.
These cases do not, as Caber argues, require reversal of the appealed order. Each of them is consistent with the proposition that an agency is not permitted by law to avoid the bid protest procedure by rejecting all bids for arbitrary or capricious reasons. None of them holds that an agency cannot, under section 120.53, reject all bids for a valid reason before a protest of an award to another bidder has been heard in a section 120.57 hearing.
We next address whether the order should be reversed for the Department’s failure to strictly comply with the time requirements specified in section 120.53(5). Those requirements, quoted above from the hearing officer’s conclusions of law,[1] were obviously not complied with by the Department in respect either to Caber’s first or second protest. Rather than strictly following the statutory procedure, the Department negotiated with Caber and tried for two months to persuade Caber to withdraw its protests before referring them for hearing. Reasonable but strict compliance with the statutory time requirements is essential to an effective bidding process. The Department’s failure to timely forward both protests for hearing unduly delayed the proceedings, the very result which the Legislature sought to prevent when it provided for the speedy referral and hearing of protests. The Department clearly violated section 120.53(5). But we conclude, for the reasons hereafter stated, that this error does not require reversal in this instance.
Section 120.68(8) provides for reversal and remand only if the court finds that “either the fairness of the proceedings or the correctness of the action may have been impaired by a material error in procedure or a failure to follow prescribed procedure.” This section has been characterized as the Administrative Procedure Act’s version of the harmless error rule. E.g., Department of Business Regulation v. Hy-man, 417 So.2d 671, 673 (Fla.1982);' Peoples Bank of Indian River County v. State, Department of Banking and Finance, 395 So.2d 521, 524 (Fla.1981). The critical elements of the rule are, therefore, whether the error is material, and if so, whether it has impaired the fairness of the proceeding or the correctness of the action. Section 120.68(8) further provides that an agency’s failure to comply with section 120.53 “shall be presumed to be a material error in procedure.” Hence, the first element has been established by statutory presumption. However, this presumption is not conclusive on the court and may be overcome in certain circumstances. See Córtese v. School Board of Palm Beach County, 425 So.2d 554, 556-57 (Fla. 4th DCA 1982), pet. for rev. denied, 436 So.2d 98 (Fla.1983). Failure to comply with time standards imposed by chapter 120 has been held not to require remand if shown not to impair the fairness of the proceeding or correctness of the agency’s action. See Department of Business Regulation v. Hyman, 417 So.2d 671, 673; Western Acceptance Co. v. State, Department of Revenue, 472 So.2d 497, 501 n. 2 (Fla. 1st DCA 1985), rev. denied, 486 So.2d 598 (Fla.1986).
We conclude that reversal and remand for further proceedings based on the Department’s failure to comply with the time requirements of section 120.53(5) will serve no useful purpose in this case. Caber eventually received a full and fair hearing of its protest of the Department’s rejection of all bids. The hearing officer determined *339 that the Department had valid grounds for rejecting bids as the result of Caber’s initial bid protest. The Department’s finding of an ambiguity in the ITB leading Caber to give it one construction while the Department and certain other bidders gave it a conflicting construction based on historical practice, is supported by competent, substantial evidence. Caber’s protest revealed that some bidders, who knew of the Department’s historical method for making awards, bid on that basis despite the ITB’s actual wording. Caber was not informed of these matters outside the bid documents and relied instead on its interpretation of the ITB terms. The basic concepts of competitive bidding were violated by the Department’s practice of written and unwritten specifications and rules pertaining to the ITB. See Aurora Pump, Division of General Signal Corp., v. Goulds Pumps, Inc., 424 So.2d 70 (Fla. 1st DCA 1982). The ITB was fatally flawed and obviously must be rebid. In answer to Caber’s second point, the Department’s rejection of all bids for this inherent ambiguity was founded on a rational basis and cannot be characterized as arbitrary and capricious. We .affirm the final order on this issue.
This decision should not be taken as suggesting that an agency can violate such time constraints with impunity or be excused from compliance therewith in every case; certainly, there will be cases in which the facts will require reversal. But an agency failing to meet these time requirements may be held accountable in mandamus for any substantial delay beyond the specified statutory period. Department of Business Regulation v. Hyman, 417 So.2d 671, 673.
AFFIRMED.
WIGGINTON, J., concurs.
BOOTH, J., concurs in part and dissents in part with written opinion.

. The hearing officer’s order made no mention of section 120.53(5)(e), which provides:
(e) Upon receipt of a formal written protest referred pursuant to this subsection, the division director shall expedite the hearing and assign a hearing officer who shall conduct a hearing within IS days of the receipt of the formal written protest by the division. The provisions of this paragraph may be waived upon stipulation by all parties.
(Emphasis added.)

. Appellant has requested reversal and remand, relief not suitable under the present status of the case. However, since the agency has ignored statutory requirements with the result that appellant's meritorious protest was rendered moot, an award of fees and costs would be appropriate. § 120.68(13)(a), Fla.Stat.; Jess Parrish Memorial Hospital v. Florida Public Employees Relations Commission, 364 So.2d 777 (Fla. 1st DCA 1978); Daniels v. Florida Parole and Probation Commission, 401 So.2d 1351 (Fla. 1st DCA 1981); Sans Souci v. Division of Florida Land Sales and Condominiums, 448 So.2d 1116 (Fla. 1st DCA 1984); Tuveson v. Florida Governor’s Council on Indian Affairs, Inc., 495 So.2d 790 (Fla. 1st DCA 1986); Groves-Watkins Constructors v. State, Department of Transportation, *340 511 So.2d 323 (Fla. 1st DCA 1987); Baxter’s Asphalt & Concrete, Inc. v. Liberty County, 406 So.2d 461 (Fla. 1st DCA 1981), reversed on other grounds, 421 So.2d 505 (Fla. 1982); see also Royal American Development, Inc. v. City of Jacksonville, 508 So.2d 528, 529 (Fla. 1st DCA 1987).

.The contract was to commence on January 27, 1987, and expire after one year.